Carnivalev vs. Staub Design Alright, Mr. Smith? Yes, Your Honor. Get some water, take your time. May it please the Court, my name is Lloyd Smith. I am counsel for the appellants John and David Staub and also Staub Design LLC. I'd like to reserve three minutes. Mr. Grant? There are two reasons this court needs to reverse the district court. Fair use and lack of intent to profit. Those are the key issues here. The second one, I'm sorry. Lack of bad faith intent to profit. Now, the court seemed to make almost the equivalent of a finding of bad – well, it did. There was trial on bad faith and the court made a finding of bad faith, correct? Yes, Your Honor. And, in effect, you're saying the evidence was not sufficient to support that. But if that is the case, that there is bad faith in a finding and we can't say it's clearly erroneous and I realize you're not conceding that. If that's the case, can you take advantage of fair use even though it wasn't dealt with by the court? In other words, doesn't a finding of bad faith negate fair use? No, Your Honor, it doesn't. The bad faith – I'm sorry, the fair use safe harbor under the Act is a separate and distinct inquiry. And it's clear, I think, from some of the case law that it must be separately considered. But if the court made a finding, separate from the intent to profit aspect, but the court made a finding, and it did, that the defendants didn't have a good faith belief that the use was lawful based primarily on their having seen the website beforehand, see that someone else was using it, and the district court said, listen, you did not – it was not fair use because you had at least in part, and the case law says at least in part is enough, I don't believe that you really had the good faith belief, or that you really believe that your use was lawful. And having made that finding, that really dooms your fair use, does it not? No, Your Honor. I don't believe, actually, the court ever made such a finding. But I would point you to the fair use standard, which is very clear. It's believed and had reasonable grounds to believe. And the facts in this case certainly support a reasonable ground to believe. And also, Your Honor, I believe what you were just saying. Well, I know it's an identical name. It's a reasonable ground to believe. It's okay. Well, thank you, Your Honor. But the point is that the name is identical to the trademark registration that was registered after my client registered their domain name. So in 2004, they went to choose a domain name. But when you chose that domain name in 2004, you knew that there was something out there from Mr. Carnaval that used basically the same words. Sure. Appellants knew that there was something out there. There were lots of things out there concerning affordable housing. It's universal. But they also saw a site that says theaffordablehouse.com, right? Yes, theaffordablehouses.com. Or affordablehousing.info, I believe, Your Honor. Those websites are in the record. And also, when they visited the appellee's website, there was no notice of any claim to trademark rights in the affordable house. It was very reasonable for my clients to assume. Mr. Carnaval put all, quote, all rights reserved, close quote, on his website. Well, sure, but almost every website has a footer at the bottom that says all rights reserved. It didn't specifically identify his claim to rights in the affordable house. But how can you say that the use of the almost precisely the exact same name, if you know somebody else is using it, that's totally in good faith that it's lawful? I mean, jumping to that presumption. I mean, the court clearly didn't buy that. Well, the court didn't buy it. But if you look at the test and the various factors, the court should have weighed them holistically and in the context of the purpose of the act. The purpose of the act is to stop people from registering other people's trademarks and selling them to them. We read the language of the act. And, you know, we have cases where, you know, maybe the language of the act is very broad. Congress drafted it very broadly. And it maybe takes in some uses that you wouldn't anticipate. And this happens to be one of them. I think your argument about the purpose of the law, you know, if someone fits within the law, we're not, you know, by its terms and its text, we're not about to say, oh, but, you know, applying it to this person wasn't the intent if it fits. And here it does. I just think that argument is a non-starter. Your Honor, I would dispute that. I think the purpose of the law is very explicitly very narrow. And that's stated in the legislative history. Because there are other remedies under the Lanham Act for these types of situations. If you believe you have a likelihood of confusion case, then you can bring an act for infringement or unfair competition. This is just for that very narrow remedy. Let me just ask a dumb question. How exactly is the Stobbs use of affordable house a fair use? It's a fair use because it's a descriptive use. Theaffordablehouse.com describes exactly what they posted at their website. And because of their history with affordable housing from their careers, it was reasonable for them to post a website concerning affordable housing and to pick a name that was descriptive of the content of their website. Except that someone else already was using that. But for that, you're right. They could pick that name. That is no problem. But when you know someone else is using it and using it in relation to a housing product, something having to do with housing, to jump to the conclusion, oh, it is automatically descriptive and it automatically means I can use it too and 43 other people can use it, that was taking a chance. And the court said, and maybe because they also said that their use was educational, not commercial, I think Judge Robinson made some credibility judgments along the way here. And I think the fact that people said they would cease and desist and then didn't, I think she probably drew some inferences from the way people had conducted themselves. And she didn't buy that they really thought this was just fine even though somebody else had it. Well, there's a lot there, Your Honor, but just to correct the record. There is a lot there. She never said that they said they would cease and desist and didn't. The record is actually very clear. They said they would cease and desist and they did. You're right. But what they did do was they opposed at the PTO the granting of any kind of registration to Mr. Carnaval. Did they not? Yes, they did, Your Honor, because they feel like descriptive, highly descriptive terms belong in the public domain. You didn't produce any evidence as to descriptive, you know, what the public believed this, the affordable house or affordable house really meant. Didn't you need to produce some evidence as to how the consumer viewed this language and these words in order to show that it was clearly descriptive or generic or something other than distinctive? Well, I don't believe there's any requirement that we prove the mark is descriptive, but these are common English language words. I mean, we see them in the paper every day, affordable house. They always are. I mean, Eskimo pie is common words. He's saying that it was suggestive. And the court was even going so far as to say it was famous, which is, we'll talk with Mr. Carnaval about that. But let's just say he's saying it's suggestive. You're saying it's descriptive. And if you are to get registration for this, you have to have something descriptive plus something else that shows it's well-known by the public. What did you put in to show that it's descriptive and that the public really doesn't recognize this much at all as anything connected with Mr. Carnaval? Well, we put in evidence of third-party use. We put in evidence of books and other websites promoting affordable housing with terms like affordable house and affordable housing. If you're asking if we're required to present survey evidence or something along that lines to rebut Mr. Carnaval's or appellee's burden to prove his case, I don't think that's necessary, and I certainly haven't seen any cybersquatting cases that have called for that kind of evidence. Well, the thing is the third-party use, I mean, everybody could be misusing. But that's just the point, isn't it, Your Honor? I mean, does a registration for the affordable house give you the right to stop everyone else from using any domain name that's even remotely similar? It's my assumption that it's distinctive because otherwise the Trademark Office wouldn't give you this right to the use. And the first person who gets there and gets that does have some rights. Well, there's two points there I'd like to address. First of all, Your Honor, Mr. Carnaval, he wasn't the first person there. He got his registration after my clients registered their domain name. Well, the domain name, yes. And second of all, the Trademark Office does give you those rights. It gives you a right to sue for infringement, but it doesn't give you a right to sue for cybersquatting and stop an innocent user of a similar domain name on the basis of cybersquatting. In other words, if Southwest Airlines wants to stop a trade association from using thesouthwest.com to promote the American Southwest, we wouldn't call that cybersquatting. We'd call that a legitimate use. They added that to the name, and they're promoting the American Southwest. The name is very similar. Clearly, clearly, clearly, two different entities. Here, both your company and Mr. Carnavali's company were in the business of home construction. Were they not? No, Your Honor. That's not right. Mr. Carnavali was selling architectural plans. My client were promoting affordable aerated concrete housing. They're entirely distinct. I mean, they're somewhat related. Still housing, is it not? It's housing, but that's a very broad penumbra. There's builders, there's architects. The Southwest versus Southwest Airlines is pretty broad as well, don't you think? Well, right. Let me get back to the Southwest example. Perhaps someone registers the Southwest, and it's a travel agency. We still wouldn't call them a cybersquatter. We might call them an infringer, but we wouldn't call that travel agency a cybersquatter because they wouldn't meet the factors under the test. Why don't you go to the factors under the bad faith intent to profit and where you see the court having made a mistake? Well, I see the court having made a mistake in several places, but factor number three, the court clearly erred by talking about priority of use instead of prior use. Prior use goes in appellant's favor because that goes to whether they were just parking the website or just having a pay-per-click site that you see in cybersquatting cases versus making actual use, which the record is clear. They made two and a half years of actual use in connection with their legitimate educational purposes. I also see factor four as a mistake. There is nothing in the law that prohibits commercial use from being a fair use, as long as it's not cybersquatting. And then overall, Your Honor, I see the court's failure to emphasize the last set of factors and the fact that they all went in my client's favor as the most important set of factors when taking in consideration of the... Which ones? You say the last set. What are you talking about? The last set. The failure of an offer to sell, the failure to register multiple domain names, and the fact that Mr. Staub registered the domain name in his own name. These are the most important factors. I point you to the Lucas Nursery case where the court recognized that and said that those are the factors that go to the true purpose of the act, and that these are the factors that should weigh in the balance the most. What about the diversion? Well, there was no true finding of diversion. It was just implied on the basis that my client registered wholesale the other side's trademark. But once again, they couldn't have done that because there was no such trademark registration at the time the domain name was registered. I see my time is up, Your Honor. All right. We'll hear from you on rebuttal. Thank you. Good afternoon. Thank you for the privilege of inviting me. In Victoria's CyberSecret versus Secret Catalogs, a southern district in Florida rejected safe harbor, saying it required a quantum leap of imagination to distinguish between. But doesn't the court have to at least bat that ball out of the air? I'm sorry, Your Honor? Doesn't the court have to at least deal with it? Well, this was something new raised at trial. If you archaeologically excavate the three years of memoranda that were held back. It was raised by your opponent. It was mentioned twice in passing as part of a longer compound sentence. It only takes once, not twice. Okay. Well, court after court has found that where evidence of bad faith exists, or as the southern district in Florida found even partial bad faith exists, safe harbor is rejected as a defense, unavailable to people that could. The court in Florida found that those acting even partially in bad faith were not entitled to benefit from the safe harbor provision. Otherwise, they went on to say, claims to not having bad faith alone were insufficient to provide a safe harbor. Otherwise, every cyber squatter, as in this case, could invoke that defense. The Fourth Circuit in Washington Speaker's Bureau versus leading authorities rejected fair use because of bad faith. The district court in eastern Pennsylvania pointed out the initial confusion of drawing the viewer to the site is the relevant confusion, and they, too, rejected the defendant's point of view. Wasn't part of the problem here is that there was a misunderstanding by the district court as to a presumption. If the PTO registered your mark after the Staubs registered their domain name, isn't technically there's no presumption that applies to you? Because they were using the mark in 04, and you came along in 06. And it's really if you do it before the suit, not before the use. So they would, before you sued or before the suit came about, they were using it. So I don't think there's a presumption that necessarily applies your way here. Your Honor, the appellants would have you believe this is solely a trademark case. Congress saw a fire and stamped it out when new criminal activities began to bubble up with the advent of the Internet, namely criminal impersonations on the Web. Well, there's nothing criminal here. They were using a – let's go to the type of mark here. Is this mark suggestive or is it merely descriptive? And if it's merely descriptive, is it descriptive with secondary meaning? That is, that the public connects it with you. The Delaware court quite rightly found that my mark did have secondary meaning. And the Supreme Court – So was that descriptive with secondary meaning or was it suggestive? In other words, there's a difference. I believe, Your Honor, Judge Robinson – You get a lot more protection if it's suggestive. But if it's merely descriptive, you get a lot less protection unless you have secondary meaning. Your Honor, Judge Robinson, who proved to be thoroughly conversant with all the facts in the minutiae – But I'm wondering if she's correct because it looks like – I'm going to give you some examples of descriptive. Universal Night Sight, U.S. Search, Entrepreneur, Thirst Aid, Apple Pie, Paper Cutter, Cozy Warm Energy Savers, Fish Fry. And I could go on and on. And affordable house sounds like that as opposed to suggestive. Maybe the best way is it's something that sort of is catchy. You know, movie buff. Legs for the pantyhose. Something like that. But this doesn't have – this is just the affordable house. That sounds on its face descriptive. Well, Your Honor, the Ninth Circuit set up a three-prong test in New Kids vs. News America. And the appellants fail on all three of those tests. In that case, they said that fair use had to be limited – Well, let's go back. Oh, I'm sorry, Your Honor. The question is, this mark that you have – Suggestive or descriptive? And you reserved your rights. But is it a descriptive mark or is it a suggestive mark? As I said, if it's suggestive, then you get more protection. If it's descriptive, you get less unless you can show that it's connected with you in some way. Well, I've used it worldwide since 1996. Her Honor found it to have secondary meaning and all the other requisite – it passed all the other requisite exams she put it to. What was the basis for the finding of secondary meaning? I believe it was confidence in the competency of the trademark office. That was a prime example. The appellants – I think it was the passage of time. But if time passes and a lot of other people are using it – That's not so, Your Honor. Does it acquire secondary meaning? The appellants claim I don't defend my mark and that others are infringing on it. But I send cease and desist letters constantly. AARP just took down a similarly named website after being contacted by me. I defend my mark constantly. Existence of this case is proof. But this isn't totally about the mark. It's about the domain name. Yes, and the appellants knew that the name was taken when they knowingly used the name, whether it was trademarked or not. Well, but then there's the question of whether it's taken or if it's merely descriptive. I mean, I go – you know, you Google and you come up with things, and there's a lot of stuff that's very similar. And if it's merely descriptive and everyone is using it, then who's to say that it's reserved to the first person who thought of using a descriptive term? I mean, that's not really the law, is it? Well, Your Honor, I have confidence in the PTO, and so far no one's proven that it's been acting incompetently. The defendants make a great deal out of the fact that I trademarked my name a number of years, a couple of years after I registered my domain name. They would have you believe this is just a trademark case. They forget to mention the fact that they continued to use my trademark name after I mailed them a copy of my domain name, my trademark name, my copyright, everything. I thought when you sent them the cease and desist letter they stopped. No, they keep claiming to court after court that they stopped upon receiving my cease and desist letter, but that's not true. They refused to stop until they got a five-pound surprise package in the mail, which was a copy of the federal lawsuit I was prepared to bring. John Staub said that all the good names are taken and any alteration would make his email address too long,  that's when they decided it would be a good idea to move to a different website. Did you file the suit at that point? Well, Mr. Smith and I had an agreement that neither party would take action against the other, that they would move to a different website, change the name, and following that they made an application to the PTO to have my trademark canceled. At that point I decided. They have a right to contest that. Well, they do, Your Honor, but they don't have a right to falsely accuse me of fraud, deceit, and falsification of documents in that still pending petition before the PTO, where John Staub, after three years of vigorous discovery attempts on my part, to wrest from them a scintilla of evidence that they had were unsuccessful. When I had him on the witness stand and he couldn't escape, I put it to him bluntly, and he admitted when they made those charges, they didn't have any evidence of any fraud, deceit, or falsification of documents. They said that they did it on advice of counsel, who then stood up and told the court that I just didn't understand how these things were done, to which I replied to the court, I didn't believe that knowingly falsely accusing someone of fraud, deceit, and falsification of documents in a legal forum was considered standard operating procedure. Let me ask you about bad faith intent to profit. There's nothing here that says that they gained or tried to gain any kind of monetary benefit from using your mark. I mean, there really was no showing that the court's finding on diversion of customers is more surmised than it is meaningful. That's how I knew about the infringement. The existence of this case alone is proof of that. And as far as – No, wait, wait, wait. Okay. What proof is there of diversion of customers or intent to divert customers by their use of the name? Well, Your Honor, if I registered Mickey A. Mouse, I'm sure Walt Disney would contact me. So just the use of the identical name is prima facie an intent to divert. That's not what it says in the – I mean, the factors don't really say that. That's how you prove intent to divert. So it's not really a factor. It's just because of similarity? Your Honor, if I open a store and I call it Sears. Yeah, but the point is with Mickey A. Mouse or Sears, those are known all over the world. Yeah, we don't know. You know, you're showing, you know, a lot of people spent $25 to get your book, but we don't know that there is something that's so attractive about your site that they're going to suddenly reap all this benefit from it. Quite frankly, there's nothing showing that your site has value. Your Honor, did you not – I'm sorry. – in your filings indicate that a number of people were contacting you saying that they were trying to find your book? Yes, but they didn't mention the appellant's site specifically except for a friend who was familiar with me, my business, and he called to say that he was no longer able to reach my website. He kept getting misdirected to that of the appellant's. And, Your Honor, I'd like to point out respectfully, whether you steal a Rolls-Royce or a Hyundai, it's still theft. Regardless of how many people look at my website, Congress wasn't interested in how successful impersonators were, just their intent to profit. What you're doing is talking about affordable housing generally. What they're doing is they have a particular type of concrete that they believe that can help in connection with different areas, public housing and whatnot, and can be socially good. You're an architect. They're not. It's hard for me to see how they would be stealing any business from you. Well, Your Honor, you've been misled. Their website, copies of which you have printouts of, show a plethora of other building types, renovations of other older buildings, pleas to get investors to construct new apartment houses. They mention other projects that they've done. It's not just aerated concrete, as they would have you believe. But how have you lost business? Have you lost business from that? Can you show that? Well, Your Honor, it's hard to prove a negative. However, two identical named websites, by definition, the value goes down by half for each one, because half the people that would be looking for me would end up at their website and vice versa. But if they're looking for architectural plans, they're going to know they're at the wrong place. When I would give out a business card or mention my website at a lecture I'd be giving or have it on my letterhead, and people would turn to that website and get misdirected to a website owned by the appellants. Is that in evidence? Was that in evidence, the actual diversion? It's how I learned of the infringement. No, no, no. Was that before Judge Robinson? Because Judge Robinson said that the use implies that defendants may have sought to divert customers, but it doesn't look like she had any evidence before her of actual diversion, misdirection, et cetera, in the record. Well, I would have to look in the record, Your Honor, but it's hard to prove who wasn't able to find you. By definition, if someone's impersonating you by name, there is going to be confusion. In fact, Well, I would think you'd have evidence of the people who wanted to get to you and couldn't get to you and said, wait a minute, they're diverting. How would that be possible if I never knew their identities because they never found me? You testified, did you not? At the trial, of course. Did you not testify that someone specifically contacted you and told you? Yes. That's how they found out about the other house. That is true, and that was what gave rise to my originally finding out about the infringement. At the time, I didn't own a computer. I went to the library every few weeks and compiled my statistics. I went to the library with the Out of curiosity, does the record indicate that the typing in of affordablehouses.com, which is your site, come up when someone types in theaffordablehouse.com or vice versa? Yes. Since 2007, in various memoranda that have been flung back and forth, I have mentioned the fact numerous times that I learned of the infringement because someone previously familiar with my website was no longer able to reach it. They kept getting misdirected to that of the Staub's. That's how I learned of the infringement. That's why I contacted them the exact same day. I sent them a cease and desist telephone, Mr. John Staub. I sent them a copy of the anti-piracy and squatting laws. I sent them a copy of my domain name registration, my copyright for my book. I sent them a copyright of my trademark. And they would like you to forget the fact that even after being informed of my trademark, they continued to still use it. So regardless of when I trademarked it, I was always protected by the domain name being registered. That's why Congress set up the system, and that's why I participated in it at the dawn of the Internet when I first learned that it was possible. I did everything I could think of as time went on to protect my name. I registered the domain name. When that became known to me that such things could be done, you forget. You're honest. We're talking about the very, very beginning of the Internet. You first registered the domain name when, in 06? Yes. It went on the air March 15, 1996. For 96. And then someone mentioned to me in passing that, you know, David, you can register those names. And that happened around 1998. Well, 96 wasn't the dawn of the Internet. Well, very few people had computers. And I would say that it was still only called the World Wide Web. It wasn't even generally referred to as the Internet. In 94, I read an article in the New York Times which first mentioned the World Wide Web in 1993 where they said that someday people were going to have computers in their homes. And that's when it occurred to me to prepare the book to be put on this new thing called this World Wide Web. In those days, there were only – But computers were introduced with respect to homes back in the 80s. I was the first architect on Earth to have a website. There were no other architects. My web host and I searched the rudimentary web at that time for anything because I was looking for some precedent. I wanted to see how to do it. And back in those days, it took them forever to translate my book into a website. All right. We have heard your argument. Okay. Thank you, Your Honor. I really appreciate the honor of being here. It was nerve-wracking but very memorable. Thank you. Thank you. Thank you. Mr. Smith, rebuttal. Could I ask you, just at the outset, I know you want to cover some things, but the chief thing you have at this point that hurts your case is that there was a trial on bad faith and the court found that your clients were acting in bad faith. Go over for me again what it is that you suggest that we should glom onto to reverse that finding of fact. Well, there's two things. First, you have to consider, the court has to consider the fair use safe harbor. And the court just whiffed it. There's no consideration of fair use. I think Judge Amber is hitting you with softball within the bad faith intent analysis of the court. And that's the other thing. If you could find within those factors, it's a pretty delicate balance that Judge Robinson did, 5-4 or 3-5 or whatever it is. How should we say a couple of those factors are wrong, wrongly analyzed, so we send it back? That's what he's asking. I don't think you even need to send it back. I think you can reverse it because the key purpose of the act, as it says, in all the legislative history and several circuits have said the same thing, the purpose of the act is to stop people from registering other people's trademarks as domain names and trying to sell them. That didn't happen here. And Lucas Nursery says. I'm going to ask you again to focus on what Judge Amber, I think, wants you to focus on. There are nine factors here. I'll go through all nine factors for you. Judge Robinson came up with an analysis that made it way in favor of the plaintiff. I think what Judge Amber is asking you and I'm asking you is which ones do you think we should flip or that she got wrong so that instead of weighing this way in favor of the plaintiff, it would weigh this way in favor of you? Is that correct? I will tell you which ones to flip. But I'd also like to give you the overall scheme. The way the act is written is the first four factors, the ones that weighed against us, those are factors that go to good faith or exculpatory factors. The next set of factors is designed to show bad faith. That's what it says in Lucas Nursery. That's what it says in the legislative history. Okay. Let's go, for example, factor one, which is that Staub's intellectual property rights in the Affordable House, District Court concluded that you had no intellectual property rights in that. That's right. And in a fair use case, it's impossible to have intellectual property. And so that's why the Utah Lighthouse case would say that if the other side doesn't have intellectual property yet either or no intellectual property, this factor can work in your favor or at least not against you. And if you look at these first four factors as exculpatory factors, they shouldn't weigh against you. They should either weigh in your favor or not weigh at all. Okay. Let's go to the second. Number two, person's name or nickname. Now, this factor is generally known as was Staub in the domain name. But the way the judge looked at it was, does the domain name have any relation at all to what's being done at the website? And she incorrectly said no. She said it didn't and then later found an intent to divert. Well, how could you divert if there's no relationship? It doesn't make any sense. So two is wrong. Three is just absolutely wrong. She applied the priority of use standard from the general trademark law, which isn't the test. The test is prior use. Well, prior to the litigation, so isn't that the argument you would make here that any presumption doesn't apply here? It does not apply and this factor works in our favor because we were making legitimate prior use prior to the litigation, prior to the complaint from the domain name owner. The next factor is bona fide noncommercial or fair use. Again, she assumed that because the use had some commercial element to it that it couldn't be fair use, but that's not the test. And she actually cited the part of the statute that says that fair use can be, she cited in her opinion that fair use can arise where you have even to profit. That's exactly what, I'm sorry, it's not the statute, it's the legislative history. So she cited that in her opinion when she discussed factor four. Intent to divert, factor five, she just implied it based on our incorporation of the other side's trademark. But yet the other side's trademark, like I said before, came along after my client registered their domain name. So all five of those factors, there's clear erroneous error. And like I said, in the overall. The six, seven dates she found in your favor. Yes. And then nine, which is strength of the affordable house as a mark, she seemed to suggest that it was suggestive? Nine is another huge error. And it goes to this, it goes to the descriptiveness versus suggestion issue. There's two problems. One is she found distinctiveness solely on the basis of the registration. She never applied the test of how does the mark compare to the goods and services. But for factor nine, she has to think about, and you hit it on it earlier, Judge Ambrose, she has to talk about the extent of the distinctiveness. The well-known factors, advertising, sales, consumer sales, consumer knowledge. Although I will say your argument in front of the district court about distinctiveness is about ten lines long. So, I mean, for us to tell her that she really didn't address what needed to be addressed is a little difficult. In any event. But she even acknowledged in her footnote that this mark is potentially descriptive. She just never went the next mile. In her footnote, in her summary judgment order, she said this mark might be descriptive of the blueprints and the online sales that it is registered for. But she never went the next step in comparing those goods and services. If she could, would that not be a basis for remand as opposed to reversal? Your Honor, it might be a basis for remand. And clearly the failure to consider the fair use safe harbor is a basis for remand. But we believe on this record it's a basis for reversal. Both unfair use and bad faith intent. All right. Thank you very much. Thank you. Thank you. Thank you, counsel. Take a matter under advisement.